PATRICIA L. GLASER - State Bar No. 55668
pglaser@glaserweil.com
HARRISON J. DOSSICK - State Bar No. 128319
hdossick@glaserweil.com
GLASER WEIL FINK HOWARD
    JORDAN & SHAPIRO LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
Phone:  (310)553-3000
Fax: (310) 556-2920

Attorneys for Plaintiff
William Keane

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM KEANE, and individual, , | CASE NO.: |
| Plaintiff, | **COMPLAINT FOR:** |
| v. | **(1) BREACH OF CONTRACT;** |
| TOP RANK, INC., a Nevada corporation; and TODD duBOEF, an individual, and DOES 1-10, inclusive,, | **(2) PROMISSORY FRAUD;** |
| Defendants. | **(3) BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;** |
| | **(4) QUANTUM MERUIT;** |
| | **(5) UNJUST ENRICHMENT; and** |
| | **(6) ACCOUNTING** |
| | **JURY TRIAL DEMANDED** |

Plaintiff William Keane ("Plaintiff" or "Keane") hereby brings this complaint against TOP RANK, INC. ("Top Rank"), TODD duBOEF ("duBoef") and DOES 1-10 ("Does") (collectively, "Defendants") and alleges as follows:

## INTRODUCTION

1.    In the business of professional boxing, Keane is tantamount to a Swiss Army knife -- an extremely well-connected fixer with all the right tools.  Top Rank's legendary co-founder and CEO, Bob Arum ("Arum"),  said as much in March 2019 when he publicly credited Keane for securing the then-upcoming Top Rank-promoted, ESPN fight between Amir Khan and Terence Crawford:

> . . . When we were trying to make Crawford-Khan, we were having difficulties with Khan because he was in Pakistan, he was here, he was there, and frankly, we have so much on our plate that we can't spend the days and weeks with a fighter that Billy [Keane] did with Amir Khan. That was the craziest negotiations. Every time Khan asked for this extra and that extra, Billy [Keane] would call us up and we'd either say, "Okay, you can offer it to him" or "No, you can't!**"  He really put the hours and the days and the time in with Amir Khan, and that eventually led to a contract with Khan to fight Terence Crawford**.[1]

2.    Nine months before Arum publicly lauded Keane's role in securing the Crawford-Khan bout, Keane had already proven to be Top Rank's most valuable resource.  Indeed, but for Keane's efforts, Top Rank likely would not have been able to secure (and certainly would not have been able to satisfy the demanding terms of) an extremely lucrative extension of its 2017 Media Rights Agreement with ESPN -- by far the company's main source of revenue.  Moreover, because (a) Arum (who turned 93 in December 2024) recently assumed an emeritus role at Top Rank, (b) ESPN's brass does not respect Arum's hand-picked successor (Top Rank President duBoef, Arum's step-son), and (c) the boxing community at large does not respect or take duBoef

---

[1] "Bob Arum Reveals The Man Instrumental In Bringing Tyson Fury And Others To ESPN; Meet Billy Keane," *Fight Hype*, April 29, 2019, available at http://www.fighthype.com/news/article37598.html (emphasis added).

Glaser
Weil

1  seriously, Top Rank effectively depended on Keane to keep its frequently challenged
2  ESPN relationship from unraveling and to help it secure desperately needed talent.

3      3.    In theory, the deal Keane made with Arum back in June 2018 fairly
4  compensated Keane for the rather unique services Top Rank sorely needed him to
5  render.  At the time, Arum (then, still at the helm) was attempting to finalize
6  negotiations to extend and substantially enrich the 2017 Top Rank/ESPN media rights
7  agreement.  As a consequence, the already palpable pressure Top Rank was under to
8  sign big-name talent was intensifying, as was Arum's need to convince ESPN that Top
9  Rank was up to the challenge.  Arum—aware that Keane had the ability to recruit
10 championship-level fighters and also enjoyed an extremely close relationship with top
11 ESPN executives—desperately needed Keane's help.  Accordingly, Arum promised
12 Keane that for each fighter he brought into the Top Rank fold, Top Rank would pay
13 him ten percent of that fighter's earnings (the "2018 Arum Deal") and assured Keane
14 that he no longer would have to rely on or chase a fighter for compensation.[2]

15     4.    Even though Keane undeniably held up his end of the deal, he has not
16 received the benefit of the bargain he struck with Arum for two reasons.  First,
17 duBoef—who subsequently took over the Top Rank reins—conned Keane into cutting
18 his finders' fee in half.  Second, to add insult to injury, duBoef distanced himself from
19 Keane and failed to pay Keane any portion of the money he is owed.

20     5.    Notably, duBoef has never claimed that Keane does not have a binding
21 agreement, nor has he ever disputed that Keane is owed millions of dollars for the
22 services rendered at Top Rank's request.  Rather, Keane is informed and believes that
23 duBoef decided to hoard and conserve Top Rank's cash, right after ESPN advised him
24 that Top Rank's $90 million/year ESPN media rights agreement will not be renewed
25 once it expires in August 2025.  Regardless of the reason, duBoef failed to keep his
26 word.  To Keane, nothing else matters. duBoef has forced Keane to expose the depths

27 ─────────────
28 [2] Arum was clear that Keane's ten percent would be paid out of <u>Top Rank's</u> earnings
rather than the fighter's earnings.

Glaser Weil

of duBoef's duplicity and ineptitude, and fight to collect every dollar he earned and unquestionably deserves.

## THE PARTIES

6.      Plaintiff, an individual, is a citizen of California who resides in the County of Los Angeles.

7.      Defendant Top Rank is a Nevada corporation with its principal place of business in Las Vegas, Nevada.  Top Rank is a leading promoter of professional boxing matches in the United States and other jurisdictions throughout the world.

8.      Defendant duBoef, an individual, is a citizen of Nevada who resides in Clark County.

9.      The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants Does 1 through 10, inclusive (individual, a "Doe Defendant" and collectively, "Doe Defendants"), are unknown to Plaintiff at this time and Plaintiff, therefore, sues such Doe Defendants by such fictitious names.  Plaintiff will ask leave of Court to amend this Complaint when the same shall have been ascertained.

10.     Plaintiff is informed and believes, and on that basis alleges, that each Defendant was responsible intentionally, or in some other actionable manner, for the events and happenings referred to herein, which proximately caused injury and damage to Plaintiff, as hereafter alleged.

11.     Any reference to "Defendants" shall refer to all named Defendants and all Doe Defendants collectively, and to each of them individually.  Any reference to a particular "Defendant" shall refer to the named Defendant only.

12.     At all times herein mentioned, each Defendant acted as an agent, servant, joint venturer, partner, employee, co-conspirator, and/or alter-ego of the other Defendants, successor corporations, successors in interest or entities, and in doing the things alleged herein acted within the purpose and scope and in furtherance of such agency, joint venture, partnership, employment, conspiracy and/or alter-ego.  Each Defendant's action alleged herein was committed with the knowledge, permission

and/or express or implied consent of the other Defendants.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. § 1332(a).  Plaintiff is a citizen of California, and each Defendant is a citizen of Nevada.  Accordingly, the action is between "citizens of different States" pursuant to 28 U.S.C. § 1332(a)(1).  Moreover, the amount in controversy exceeds the sum or value of $75,000.  Therefore, this Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(a).

14.    This Court has general and/or specific personal jurisdiction over Defendants because (a) each of them has continuous and systematic contacts with the State of California and/or (b) of the specific conduct at issue in this action.   In connection therewith, Defendant Top Rank *inter alia* is registered to conduct business in California, has a designated agent for service of process in California, and actively promotes professional boxing matches held in California.

15.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims pleaded herein occurred in this judicial district.  Venue also is proper in this Court pursuant to 28 U.S.C. § 1391(b)(3) because Defendants are subject to personal jurisdiction in this judicial district.

## STATEMENT OF RELEVANT FACTS

### Boxing Veteran Billy Keane

16.    Keane has been around boxing his entire life.  His father taught him to box and trained him to compete in the ring in the late-1970s, when he was attending grade school in Chicago.  By the mid-1980s, Keane had won several local amateur titles, including the 1984 Chicago Park District Championships.

17.    After he moved to Los Angeles in 1989, Keane befriended Boxing Hall of Fame/five-time Trainer of the Year Freddy Roach, and continued to train at Roach's Hollywood gym.  Keane soon became Roach's chief assistant, a role he held for a

decade, and his duties included helping Roach prepare his fighters for world title bouts. During Keane's tenure with Roach, the two of them often discussed how boxers were being exploited and envisioned managing fighters together.

18.     In the early 2000s, while still working alongside Roach, Keane developed a long-lasting friendship with Manny Pacquiao who, at the time, was signed to Top Rank.  On fight nights, Keane would inspect the hand wraps and gloves of Pacquiao's opponents to make sure they literally had nothing up their sleeve.

19.     By 2006, Keane and Roach started to co-manage fighters aligned with Oscar De La Hoya's Golden Boy Promotions.

20.     In 2010, Keane signed on to manage welterweight Jose Benavidez Jr., then a highly promising amateur and future world champion.

21.     In 2011, Julio Cesar Chavez Jr. approached Keane to manage him.  For the next four years, Keane managed Chavez Jr. while he was under contract with Top Rank.  In May 2018, Keane signed an agreement to manage former super middle weight world champion David Benavidez (Jose Benavidez Jr.'s younger brother).  As alleged below in paragraphs 33-36, although Keane's professional relationship with David Benavidez was short-lived (thanks, in large part, to Arum), as a result of the ordeal, Arum apparently had an epiphany -- he needed to convince Keane to give up managing and have him recruit fighters for Top Rank, acting as an independent free-agent.

**Top Rank, ESPN And Their Past Boxing Venture**

22.     Top Rank, co-founded by Arum in 1973, has been promoting professional championship boxing matches for more than 50 years.  During that time, the company has promoted fights featuring the biggest names in the sport, including Muhammed Ali, Joe Frazier, George Foreman, Larry Holmes, Marvin Hagler, Manny Pacquiao, Sugar Ray Leonard, Floyd Mayweather Jr., and Tyson Fury.  In addition, the company's content library includes some of the greatest fights in history, like Hagler vs Leonard, Hagler vs Hearns, Ali vs. Frazier II, and both of the bouts between Ali and Spinks.

23.     ESPN, now principally owned by The Walt Disney Company, launched in

1979.  A year later, the fledgling cable channel formed a partnership with Top Rank to televise weekly boxing matches.  The co-branded show, titled *Top Rank Boxing on ESPN*—the first regularly televised boxing series since 1964—ran for 16 consecutive seasons.  The show ended in 1996, when ESPN decided to change direction in favor of lower-budgeted programming titled *Friday Night Fights,* which aired on ESPN2 and featured fights from promoters other than Top Rank.

24.    ESPN and Top Rank would not join forces again for another two decades.  In the interim, the popularity of boxing waned as the nascent sport of mixed martial arts grew steadily into a multi-billion dollar, star-driven juggernaut featuring athletes that crossed over into established high-value industries like fashion, premium spirits, television shows and motion pictures.  These inter-industry synergies rose to a crescendo in July 2016, when UFC—the premier mixed martial arts league that, like Top Rank, hails from Las Vegas—was purchased by a WME/IMG venture for the staggering price of $4 billion.  The impact of this acquisition on Top Rank and other promotors intensified shortly after the UFC sale was announced, when its President publicly hinted that UFC's new backers were thinking of expanding into boxing.

25.    Four months later, Arum would learn that UFC's President was not bluffing.  According to an August 26, 2017, article published in *The Hollywood Reporter,*

> The week before Thanksgiving last year, Bob Arum, the founder of Top Rank Boxing who has been in the fight game since 1966 (when he started as Muhammad Ali's promoter), was at home in Las Vegas when he got a call from [WME CEO] Ari Emanuel. "He says, 'I'm getting on a plane,'" recalls Arum, 85. When they met Nov. 22, Emanuel told Arum, who was joined by his stepson and Top Rank president Todd duBoef, that he wanted to buy the Top Rank library, which is stocked with iconic fights, including the 1975 "Thrilla in Manila" between Ali and Joe Frazier.[3]

---

[3] "ESPN Inks Top Rank Megadeal to Bring Boxing 'Back Into the Forefront of Sports' (Exclusive)," *The Hollywood Reporter*, August 26, 2017. https://www.hollywoodreporter.com/news/general-news/espn-inks-top-rank-megadeal-bring-boxing-back-forefront-sports-1031482/

26.    WME's CEO presumably believed that Arum thought boxing's glory days were a thing of the past and would jump at the chance to cash out.  If so, he was mistaken on both accounts.  And, he had waited too long to make his move.  In reality, Arum was not interested in selling.  Just the opposite, he was looking "to build something" and make a play to revitalize professional boxing.[4]  To that end, Arum had already engaged a major Hollywood talent agency (Creative Artists Agency) and investment bankers, and was in active negotiations to reunite with ESPN.

**The 2017 Top Rank/ESPN Media Rights Agreement**

27.    Top Rank and ESPN entered into a four-year media rights agreement in August 2017.  According to the terms of their multimedia deal, Top Rank would promote live boxing matches for exclusive exhibition on ESPN, ESPN Deportes, the ESPN App, and ESPN+ (ESPN's then-newly announced direct-to-consumer streaming service), and ESPN would also deliver select fight events on pay-per-view  (the "2017 ESPN Agreement").

28.    The initial Top Rank/ESPN bout under the newly announced 2017 ESPN Agreement aired a month later when WBO champions Oscar Valdez (Featherweight) and Gilberto Rameriz (Super Middleweight) each defended their titles on the same fight card.  By early 2018, it was clear to all involved that the performance of the 2017 ESPN Agreement was exceeding expectations, and the parties commenced negotiations to expand the terms and extend the duration of their relationship.

29.    When the 2017 ESPN Agreement was signed, Arum was less than four months shy of celebrating his 86th birthday.  The succession plan Arum mapped out for his company had been put into effect years earlier, and it was hardly a secret in the industry.  duBoef, Arum's stepson, who had been serving as Top Rank's President since 2004, was managing the day-to-day affairs of the business and whenever Arum decided to step down (or could no longer manage the business), duBoef would assume full

---

[4] *Id.*

control of the company.

30.     With that said, it also was hardly a secret in the industry that duBoef could never fill Arum's shoes.  Arum had been the larger-than-life frontman, master promoter and brains of Top Rank since day one.  duBoef did not excel in any of those capacities, especially when it came to signing and promoting big-name fighters.  To make matters worse, Arum had expressed to Keane and others that ESPN's executives did not respect duBoef.   Accordingly, Arum understood that in order to make the 2017 ESPN Agreement work, he needed to find a "fixer" – *i.e.*, someone capable of managing the ESPN relationship and bringing big-name, championship-caliber fighters to Top Rank.  Arum viewed Keane as the perfect fit.

**The 2018 Arum Deal**

31.     When Keane signed on to manage David Benavidez, Keane knew Benavidez was being promoted by Sampson Lewkowicz of Sampson Boxing.  But Keane also knew that Arum was eager to promote David Benavidez once the term of his then-current promoter contract expired, so Keane arranged for his new fighter to meet with Arum.  Their sit-down did not exactly go as Keane expected.  Instead of discussing a future deal, the younger Benavidez brother told Arum that Sampson Boxing was not honoring the terms of its promotion agreement and, when all was said and done, he walked out of the meeting with a new Top Rank promotional agreement and a $250,000 signing bonus check.

32.     Sampson Lewkowicz not surprisingly was less than thrilled to lose his champion super middleweight fighter to Top Rank and immediately sued Arum, Top Rank and Keane for tortious interference.  Two weeks later, David Benavidez had a change of heart, fired Keane, gave back Top Rank's check, and returned to Sampson Boxing.  Arum claimed it was all a misunderstanding, and Lewkowicz took the win -- for the most part.  He publicly forgave David Benavidez, exonerated Arum, dismissed him from the case, and blamed Keane for everything.  According to Lewkowicz,

Keane misled Bob Arum, Top Rank and the whole Benavidez

1
2
3

family. David called me and he apologized, and my lawyers will drop the lawsuit this week. But Billy Keane misled everyone. I will sue him individually and I will teach him a lesson not to steal anymore.[5]

4    Even though Keane felt as though he had fallen victim to the adage "no good deed goes

5    unpunished," he understood that unless he wanted to burn his Top Rank bridge (he did

6    not), he would have to play the part of the fall guy.

7        33.    Arum repaid Keane's loyalty in two different ways. First, he authorized

8    Top Rank's go-to litigation counsel (O'Melveny & Myers) to represent Keane in the

9    Sampson Boxing lawsuit; and, second, he asked Keane to meet with him and Top

10   Rank's in-house lawyer at the Four Seasons hotel in Las Vegas to discuss the future of

11   their relationship. At the start of their meeting, Arum acknowledged that Keane had

12   every right to be disappointed with Benavidez's decision, but told him not to worry.

13   Arum then told Keane that trying to sign fighters to management deals was a waste of

14   energy, explained that Top Rank needed Keane's help to sign fighters under Top

15   Ranks' deal with ESPN, and said he would pay Keane <u>directly</u> for each fighter he

16   delivered to Top Rank.

17       34.    Arum further explained during their meeting that he was currently

18   negotiating a new, much bigger deal with ESPN and, under the new structure, Top Rank

19   would have to sign big-name boxers. Arum told Keane how much he valued Keane's

20   relationship with ESPN's CEO and said he needed Keane to help convince ESPN that

21   Top Rank would be able to sign big name fighters and deliver for ESPN. He also said

22   he needed Keane to help manage the Top Rank/ESPN relationship.

23       35.    Arum told Keane he was the perfect fit because he knew how to relate to

24

25   [5] "David Benavidez Gives $250K Bonus Back to Top Rank, Returns to Sampson,"
     *ESPN.com*, June 12, 2018, available at
26   https://www.espn.com/boxing/story/_/id/23766714/david-benavidez-gives-250000-
     bonus-back-top-rank-returns-sampson.
27

28

fighters, and Top Rank needed an outsider to approach fighters so Arum could maintain plausible deniability in case any other promoters were to accuse him of tampering.  He also explained that although Keane would be working for him and Top Rank exclusively, Top Rank needed to create the impression that Keane was an independent free agent.

36.    Consistent with the foregoing, Arum convinced Keane that he no longer would have to worry about signing fighters, chasing them for payment or being asked to reduce fees to close management agreements.  According to Arum, Keane only needed to bring fighters to Top Rank and Top Rank would pay Keane 10% of every dollar those fighters earned,[6] mimicking what he would be making as a manager but selling Keane on how much easier it would be.

37.    Keane agreed to Arum's terms (thereby forming the legally enforceable, 2018 Arum Deal), and said he would speak with ESPN and start meeting with prospective big name fighters to bring to Top Rank/ESPN.

**The 2018 Top Rank/ESPN Seven-Year Extension**

38.    On August 2, 2018—approximately two months after Keane entered into the 2018 Arum Deal—Top Rank and ESPN publicly announced they had agreed to extend the four-year 2017 ESPN Agreement deal (which they had signed less than a year earlier) for seven years, until August 2025.  Under their new deal, touted as the most comprehensive, exclusive media rights agreement in the history of boxing, ESPN agreed to carry a total of 54 Top Rank live events each year, including 24 premium international fights that would air exclusively on ESPN+, "the new multi-sport, direct-to-consumer subscription streaming service" that the Disney-owned company had launched just four months earlier and was aggressively promoting at the time (the "2018 ESPN Extension").

---

[6] Arum was clear that Keane's fee would not be based on or affected by Top Rank's earnings.  Even if Top Rank lost money promoting a fight, if Keane's fighter got paid, Keane would receive ten percent of the fighter's purse directly from Top Rank.

39.     Convincing ESPN to extend the duration and enhance the terms of the 2017 ESPN Agreement was no small task for Arum.  Just as Arum alluded to months earlier when he convinced Keane to relinquish his quest to manage fighters in favor of the 2018 Arum Deal, ESPN had misgivings about extending and expanding the 2017 ESPN Agreement – and for good reason.  As noted above, the enhanced revenue terms Arum was advocating *presumed* Top Rank would be able to sign top-tier boxers.  At the same time, however, the parties were nearly ten months into the 2017 ESPN Agreement, and Top Rank had yet to deliver.

**Keane Holds Up His End Of the Bargain**

40.     At Arum's and duBoef's direction and insistence, Keane constantly and consistently assured ESPN that Top Rank had the experience, capabilities and business savvy required to dominate and re-energize boxing akin to the way UFC emerged as the dominant force in MMA.  At duBoef's urging, Keane also assured ESPN on numerous occasions that he (Keane) would be able to pull big name fighters into the Top Rank camp.[7]

41.     Further to Keane's assurances and efforts to assuage ESPN's legitimate concerns—actions Keane would not have taken but for his reliance on the compensation terms of the 2018 Arum Deal—ESPN agreed to enter into the 2018 ESPN Extension in accordance with the enhanced revenue structure crafted by Arum, which more than doubled the amount of Top Rank's annual media fee revenue (from approximately $35 million to $90 million), and nearly doubled the duration of ESPN's annual payments (from four years to seven years).

42.     Additionally, in reliance on Arum's promises and representations, and consistent with the terms of the 2018 Arum Deal, Keane immediately began to recruit top-tier boxers for Top Rank.  On June 15, 2018, at Arum's and duBoef's direction and

---

[7] duBoef attempted to convey similar assurances to senior ESPN executives without success because, as duBoef explained to Keane, those executives would push duBoef off to "lightweight," lower-level ESPN employees.

with their consent, Keane approached Gennady "GGG" Golovkin through his representative.  In connection therewith, Keane incurred travel and other expenses in the amount of $3,358.00, which Top Rank reimbursed in full.

43.   Golovkin, however, ultimately spurned Top Rank and signed with DAZN, a chief competitor of ESPN+ headed by John Skipper, the former head of ESPN.

44.   In November 2018, after consulting with Arum and duBoef, Keane approached Amir Khan to fight Terence Crawford in Top Rank's first Pay-Per-View event for ESPN.  Finding an opponent for the Crawford fight was a top priority for Top Rank because ESPN had been promised a pay-per-view fight under the 2017 Four-Year Deal and Top Rank had not yet been able to deliver.  Arum and duBoef wanted Khan on the card even though they were aware that Khan was under contract with another promoter and was in discussions for a different fight, and told Keane he first needed to block Khan from taking the other fight and then needed to convince Khan to take the Crawford fight with Top Rank.

45.   To that end, and further to duBoef's instructions, Keane traveled to London and was prepared to conduct a *faux* negotiation with Khan as a ploy to convince Khan to fight Crawford.  However, when Keane met with Khan in London, he was able to reach an agreement with Khan on the Crawford fight without resorting to any trickery.  As before, Top Rank paid Keane's travel and related expenses, this time in the amount of $31,628.00.

46.   On January 17, 2019, when Arum made the official announcement that Khan would fight Crawford as an ESPN Pay-Per-View event, he publicly credited Keane for putting the fight together:

> . . . there's someone here who is very good friends with Amir Khan.  A gentleman who is here now from California named Billy Keane.  And Billy went over to England and spent over two weeks.  They are getting messages back-and-forth to me from Amir and Amir to me.  And it's because of his effort that we were able to put this fight together.  It goes to

show you where there's a will there's a way."[8]

**January 2019:  duBoef Fraudulently Induces Keane To Renegotiate His Fee**

47.    On or about January 24, 2019—a week after Arum publicly praised Keane for convincing Khan to take the Crawford fight—duBoef approached Keane about his fee and claimed they needed to renegotiate the terms of their arrangement.  According to duBoef, Top Rank did not expect Keane to deliver such a high-profile fighter, and because Khan demanded a much larger purse to fight Crawford than had been anticipated (at least $5 million), Top Rank would not be able to pay Keane the ten percent fee Arum had promised.  Keane, not surprisingly, objected and remined duBoef that he did exactly what Arum had directed him to do (*i.e.*, convince Khan to take the Crawford fight) and it was too late to change the terms of their deal.

48.    duBoef refused to back down.  He insisted that Top Rank could only afford to pay Keane five percent of Khan's purse.  However, to induce Keane to accept a fifty percent reduction of the fee Arum had promised, duBoef assured Keane that if he accepted five percent for Khan and for all future fighters he recruited, Keane would become Top Rank's "primary" recruiter.  duBoef further represented that because Top Rank needed to bring in many additional fighters to satisfy the terms of the 2018 ESPN Extension, if Keane agreed to act as *the* recruiter for Top Rank, he would end up making more money at five percent than he would by being one of many Top Rank recruiters at ten percent.

49.    duBoef also represented to Keane that if he took the deal he would more easily be able to recruit boxers to fight for Top Rank for two reasons.  First, duBoef was highly critical of, and frequently made insulting, defamatory, and racially charged

---

[8]  https://www.youtube.com/watch?v=0rueA7AR5vY  (7:25 mark).  Approximately three months later (April 20, 2019), Crawford defeated Khan by TKO after accidentally landing a low blow in the sixth round.  The fight was aired live on ESPN.  Khan earned approximately $8.6 million in defeat.  Top Rank thereafter timely paid Keane his fee which, for the reasons explained in Paragraphs 47-51, had been conditionally reduced from ten percent to five percent.

comments about, other boxing managers, including James Prince, David McWater, Keith Connolly, and Rick Mirigian; duBoef said dealing with people of this caliber was not an effective use of his time; and duBoef claimed he would bring all the business through Keane and only deal with Keane. Second, duBoef assured Keane that he would make a lot more money because he and Keane would be long-term "partners."

50.    Keane, aware that Top Rank had a strong incentive under the 2018 ESPN Extension to sign as many top fighters as possible, believed that duBoef's representations were genuine. Nevertheless, Keane was reluctant to accept duBoef's offer because Keane also knew that Top Rank had a well-deserved reputation for engaging in tactics like slow-paying, part-paying, withholding payment, reneging and the like to exert control over and compel loyalty from third parties like Keane. As a consequence, Keane did not accept duBoef's offer until duBoef gave Keane his express personal assurance that Top Rank at all times would pay Keane promptly, without delay, and would not approach Keane again to reduce his fee below five percent. In addition, Keane made clear to duBoef that if he failed to pay Keane his full five percent fee as promised, Keane's fee would retroactively and prospectively revert back to the original ten percent Arum had promised, and duBoef agreed to and accepted this specific caveat.

51.    On or about January 24, 2019, duBoef accepted Keane's conditions and assured him that he would be paid timely and in full (thus forming a new agreement that *conditionally* reduced Keane's fee from ten prevent to five percent of each fighter's earnings) and told Keane he made the right decision (the "2019 duBoef Agreement").[9]

---

[9] As alleged below in Paragraph 84, certain essential terms of the 2019 duBoef Agreement were later memorialized in writing by Keane on or about February 15, 2023, and consented to by duBoef in writing on or about February 16, 2023. Accordingly, as a matter of law, the 2019 duBoef Agreement constitutes an agreement in writing rather than an oral agreement.

**2019: In Reliance On duBoef's Assurances And Promises, Keane Travels To Dubai To Secure A Deal With Tyson Fury**

52.     In December 2018, after Tyson Fury fought Wilder to a controversial draw, signing Fury was at the top of Arum's and duBoef's wish list.  They both believed Fury had the potential to become a superstar and said he can be "the next Ali."  But, neither of them could approach Fury directly because Arum had a relationship with Frank Warren, Fury's then-current promoter, and Arum did not want to burn that bridge.  Arum also feared that if he tried to poach Fury, Warren would likely take legal action.  However, because Keane was a well-known fight manager, and Top Rank consistently claimed Keane was an independent operator with close relationships at ESPN, Arum and duBoef reasoned that Keane should approach Fury directly and try to make an end run around Warren.

53.     Immediately after Keane agreed to the 2019 duBoef Agreement, duBoef pressed Keane to do anything and everything possible to convince Fury to sign with Top Rank.  duBoef emphasized that when Keane made contact with Fury, he had to make sure to convince Fury that he was looking out for ***ESPN's*** interests and that neither duBoef nor Arum knew Keane was trying to convince Fury to sign with Top Rank.

54.     Keane understood at the time (*i.e.*, late February 2019) why duBoef was so desperate to sign Fury.  It had been more than six months since Top Rank signed the 2018 ESPN Extension, Top Rank was earning more money under the new deal terms but had not yet signed any new, meaningful talent, ESPN was not happy, and duBoef needed to turn the tide in his favor.  To make matters worse, Top Rank's streaming competitor, DAZN, had signed Canelo and also beat out ESPN to sign Gennady "GGG" Golovkin.

55.     On or about January 26, 2019, Keane was able to make contact with Fury's advisor – Daniel Kinahan, an Irish boxing promoter and alleged organized crime boss

who was living in Dubai.[10]  On January 30, 2019, Keane notified duBoef in writing that his contact in Dubai was in fact Daniel Kinahan and Kinahan wanted to ensure that Top Rank and duBoef knew of his involvement from the beginning so it would not later jeopardize the deal.  Kinahan represented to Keane that he could arrange for Fury to sign with Top Rank on two conditions: (a) Top Rank would have to pay him an agreed percentage of Fury's fight purses, and (b) Top Rank would have to give MTK (the management company started by Kinahan) an output deal to assure that Kinahan's other fighters received television exposure.

56.    When Keane discussed Kinahan's proposal with duBoef, duBoef provided very specific instructions.  He authorized Keane to move forward, but he admonished Keane that ESPN could not find out that Kinahan was involved.  According to duBoef, the Irish press had reported that Kinahan was the head of a drug cartel, and if duBoef were linked to Kinahan, ESPN might be forced to terminate their deal.

57.    Keane's next set of instructions also came directly from duBoef.  *First*, duBoef directed Keane to fly to Dubai immediately, meet with Kinahan, and get Fury to sign with Top Rank before his upcoming rematch with Deontay Wilder was announced.  *Second*, Keane was told to call ESPN executives and get them "excited" about carrying Fury's rematch with Wilder.  *Third*, because Top Rank would need additional funding from ESPN to sign Fury, duBoef told Keane to push that agenda internally at ESPN.   Despite having legitimate concerns for his own personal safety, Keane did not quarrel with duBoef's orders.  Keane had conversations directly with ESPN executives who had expressed extreme frustration with Top Rank and duBoef.  ESPN was running out of patience and losing faith in Top Rank's ability to sign A-list

---

[10] Kinahan was no stranger to duBoef.  In 2016, Top Rank signed former Irish Olympic boxer Michael Conlan to a multi-year deal.  At the time, Conlan was managed by MTK Global, a boxing and MMA management and events promotion company founded by Kinahan.  When Top Rank promoted Conlan's first professional fight in March 2017, duBoef had arranged for MMA star/fellow Irishman Connor McGregor to walk Conlan out of his dressing room up to the ring.  When McGregor tried to back out, duBoef bragged openly in private boxing circles that he had Kinahan "lean on" McGregor and force him to honor his commitment (Keane has no idea if this claim is true).

fighters, and Keane also believed that if Top Rank could secure Fury-Wilder II, ESPN's concerns would be allayed.

58.    Keane spent the next two weeks in Dubai courting Kinahan and Fury, and all of his expenses—more than $27,000—were reimbursed by Top Rank. But, just as negotiations appeared to be wrapping up, the deal hit a snag when Fury, who apparently did not trust Top Rank, expressed concern over Top Rank's ability to honor its financial commitment and insisted that ESPN had to guarantee his contract. When Keane relayed the news to duBoef, duBoef panicked. duBoef could ill-afford to lose the Fury signing on the heels of the Golovkin/DAZN debacle, he had already convinced ESPN/Disney that the additional millions in licensing fees needed to cover Fury's purse was justified because Fury would drive subscribers to Disney's new ESPN+ streaming service, and asking ESPN to guarantee Fury's contract was out of the question as it would clearly signal weakness.

59.    Keane knew he had only one option. He had to turn to Kinahan for help. He did, and Kinahan offered to personally guarantee Fury's contract. Although Kinahan's personal guarantee was sufficient for Fury, Keane was concerned that duBoef might balk at the idea of allowing Kinahan to serve as a guarantor for duBoef's contract with Fury. If duBoef had any trepidations, he kept them to himself. When Keane advised duBoef, by text, that "[Kinahan] said that none of this is going to be an issue. He said he is going to personally guarantee the money w Tyson so [Top Rank] not paying or bob dying is not an issue," duBoef sent the following text in response: "Now that makes sense."

60.    Fury signed with Top Rank in late-February 2019. A month later, Arum publicly credited Keane for putting the deal together:

> The Deontay Wilder fight with Tyson Fury is something that we would love to do, and that's a real goal and it's something that we will do. Billy Keane, who is a very, very close friend of Jimmy Pitaro, the head of ESPN, was doing something totally different in the Mideast with MTK Global and it was obvious that Tyson Fury could be in play. So Billy talked to Tyson

Fury and explained what it would mean for him to come with Top Rank and get the exposure that ESPN, the greatest megaphone in sports, could give him. . . .  That's really our goal. When Billy was talking to him, you know, Billy is not an employee to Top Rank. He's a free agent.  When he came back and talked to us about his conversations with Tyson Fury, we said we could offer him X and Y, and then when Billy offered that, he was talking to Top Rank. In other words, he is not a guy who makes up a number and then comes back to Top Rank and says, "We need this number."  When he offers a fighter something, it's with the [] approval of not only Top Rank, but ESPN.[11]

**duBoef Instructs Keane to Poach More Frank Warren Fighters**

61.    After Fury signed with Top Rank, Keane flew to Dubai with duBoef and other executives to meet with Kinahan.  Meeting Kinahan seemed to energize and embolden duBoef.  Before duBoef met Kinahan, he was on his heels and seemed paralyzed with concern over pleasing ESPN.  Afterwards, he carried himself as if he had the support of a private army and started talking about taking over boxing globally. He also told Keane that he wanted to sign more UK fighters with Kinahan to please ESPN, whom duBoef referred to as "the guys in Connecticut."

62.    After the Kinahan meeting, duBoef gave Keane a list of all the fighters he wanted Top Rank to sign, including Callum Smith, BJ Saunders, Carl Frampton and Josh Taylor.  All were signed to other promoters, and duBoef instructed Keane to have Kinahan convince all of them to sign with Top Rank.  duBoef also told Keane to enlist Kinahan's help to take all of Frank Warren's fighters, put Warren out of business, and expand Top Rank's operations in the UK.

**Keane Secures Fury v. Wilder II and III For Top Rank/ESPN**

63.    As Arum had publicly stated, Top Rank was expecting to promote the Fury/Wilder rematch on ESPN.  Easier said than done, however, because no one at Top Rank (including Arum) currently had a working relationship with Al Haymon or Shelly

---

[11] "Bob Arum Reveals The Man Instrumental In Bringing Tyson Fury And Others To ESPN; Meet Billy Keane," *Fight Hype*, April 29, 2019, available at http://www.fighthype.com/news/article37598.html

Finkle (Wilder's advisors), and that meant Keane would have to figure it out.

64.    With duBoef's knowledge and consent, Keane worked with Kinahan to orchestrate conversations and pursue a deal with Wilder's advisors for the Fury rematch.  At one point during the negotiations, Keane sensed Wilder was trying to back out of the fight and advised duBoef.  In response, duBoef said Kinahan should "lean on" Wilder's manager, Shelly Finkle, to get the deal back on track.  duBoef also instructed Keane to advise Wilder's trainer, Jay Dees, to use a racially insensitive trope to persuade Wilder not to sign with John Skipper and DAZN.  duBoef later made a reference to his inappropriate comment in a text message to Keane.  Further to the same goal, duBoef used an even more offensive term to describe how Wilder supposedly was being treated by Al Hayman.  Keane pretended to play along with duBoef's offensive remarks for fear of reprisal.

65.    Keane ultimately succeeded in helping to broker the deal for Wilder to fight Fury for a second time on ESPN (a split broadcast with Fox).  Keane also secured the third Fury v. Wilder bout on ESPN.

**2019: duBoef Instructs Keane To Secure A Multi-Year Agreement With Kinahan To Serve As Top Rank's International Consultant**

66.    In early 2019, duBoef learned that UFC's president was planning to expand his operations into professional boxing.  That made duBoef nervous for many reasons, including because duBoef feared that UFC's expansion could interfere with duBoef's plans to expand Top Rank's business.[12]  duBoef believed Kinahan could help him solve both problems and, once again, he turned to Keane to do his bidding.

67.    In March 2019, duBoef instructed Keane to secure an agreement to make Kinahan Top Rank's exclusive consultant outside of the United States to help orchestrate Top Rank's strategic move into foreign territories.  Kinahan was willing to

---

[12] In duBoef's view, UFC would be a competitor on ESPN and duBoef feared UFC would eventually get the entire ESPN boxing deal as UFC was so well liked and well respected as an operator.

assume that role.  However, after he and Keane had reached an agreement in principle, Kinahan became upset with duBoef, who had started to backpedal due to concerns that once Arum found out he would kill the deal.[13]  duBoef naturally asked Keane to smooth things over with Kinahan before duBoef would speak with him directly.  duBoef expressed that having Kinahan's muscle exclusively backing duBoef would be a massive advantage when it came to potential competitors and duBoef's plans for European expansion.

68.     duBoef and Kinahan ultimately were able to finalize their deal.  Concerned Arum would overrule him if he found out, duBoef decided to pay Kinahan millions of dollars for his exclusivity to Top Rank "under the table" without Arum's knowledge or consent.

**2021: duBoef Expresses Second Thoughts About His Kinahan Alliance, Demands Keane's Loyalty, And Re-Assures Keane They Are "Partners"**

69.     In or around March and April 2021, duBoef expressed the following to Keane, in strict confidence:

a.     duBoef was working on a big UK network deal with Sky Sports. According to duBoef, the Sky Sports deal would put Frank Warren and Queensbury out of business and clear a path for Top Rank to dominate the UK.  duBoef claimed this would be the start of his plan to make Top Rank the dominant global force in professional boxing akin to UFC's global domination of MMA.

b.     duBoef was concerned, however, about his alliance with Kinahan.

---

[13] Accordingly, duBoef told Keane that Arum could not know about the new Kinahan arrangement.  duBoef claimed that Arum was too old and would never understand that he was building a global  "media company" and needed Kinahan's "muscle" to compete with UFC and expand into Europe.  However, duBoef was oblivious to the fact that both Kinahan and Arum had no confidence in his judgment or management acumen. In fact, while in Kazakhstan, Kinahan confided in Arum that he was concerned about duBoef's ability to lead the company after a meeting in which Kinahan told Arum how disliked duBoef is throughout boxing and is viewed as utterly incompetent.  When they returned to the United States, Arum confided in Keane and shared his concerns about duBoef's competence and potential as the future leader of Top Rank.   Arum then instructed Keane to manage the Kinahan relationship and "not let [duBoef] fuck it up."

1   According to duBoef, if Sky Sports learned that Top Rank was affiliated with Kinahan,

2   it would blow the deal because Kinahan was still the subject of negative press in the

3   UK.

4            c.     Even though duBoef said he needed Kinahan's MTK roster of UK

5   fighters as well as Kinahan's ability to poach Queensbury fighters at will, he told Keane

6   that he was going to have to publicly, and to some extent privately, distance himself

7   from Kinahan.  As a consequence, duBoef told Keane that he needed him to fully take

8   over the relationship with Kinahan and manage the relationships with all of Top Rank's

9   UK fighters.

10            d.     duBoef told Keane that he considered him to be his partner and

11   needed assurances that Keane would be loyal to **him**, rather than to Arum,[14] Kinahan

12   or anyone else.  duBoef claimed that he didn't have anyone like that at Top Rank.[15]  He

13   told Keane that he wanted to build a long-term partnership with him and needed his

14   help to execute his global Top Rank takeover strategy.  In this same context, duBoef

15   frequently reminded Keane that Arum would not be around much longer and that he

16   (duBoef) had no number two.  Relatedly, on several occasions duBoef instructed Keane

17   to advise third parties that they should only deal with duBoef because Arum was senile.

18   Keane did not have that impression and, out of respect for Arum, Keane did not follow

19   duBoef's instruction.

20

21

22   [14]  duBoef expressly admonished Keane not to speak with Arum about Top Rank
23   business.  He told Keane that Arum suffered from dementia and was no longer capable
     of running the company, and said Arum did not realize that Top Rank was a media
24   company and no longer was simply in the business of promoting boxing matches.

25   [15]  Specifically, duBoef told Keane that even his COO and Vice President were just
     "worker bees" who "kept the trains running on time."  duBoef also told Keane that they
26   were not big thinkers, but rather were "low level boxing guys" who did not understand
     media and had no comprehension of duBoef's concept of "awareness equaling
27   currency."  He frequently told Keane that he was a "hunter" and they were just
     "farmers," and said that's why he was willing to pay Keane so much more.  duBoef
28   further referred to the rest of Top Rank's employees as "monkeys" who got paid
     peanuts.

**duBoef's Racist Reputation Prevents Keane From Signing Several Fighters Represented By A Prominent Mexican-American Attorney**

70.     On or around January 15, 2021, Keane was contacted by a prominent San Diego, California attorney who represented professional boxers.  He had just been retained by a world champion Top Rank fighter, had concerns about his new client fighting for Top Rank, and wanted Keane to help broker a relationship with the promoter.  During the course of their discussions, the attorney inquired whether ESPN would be interested in some of his other fighters, including one of boxing's pay-per-view stars, who is Mexican-American.

71.     Mindful of duBoef's demands that Keane needed to be absolutely loyal to duBoef and should not deal with Arum, Keane spoke to duBoef about the opportunity to establish a relationship with the attorney and the potential to sign his fighters.  duBoef was excited by the news and encouraged Keane to tell the attorney that he (duBoef) was a "good guy" and they should work together.

72.     When Keane circled back to set up an initial meeting with duBoef, the attorney erupted and said he would never meet or speak with duBoef.  When Keane asked why, the attorney explained that duBoef is well-known in the Mexican and Mexican-American communities for being a racist, and he also said that Top Rank's own partners who co-promoted events in Mexico told him directly that duBoef had referred to the attorney in a racially offensive manner.[16]  As a result, the initial meeting never took place, and Keane to this day believes Top Rank would have signed a well-known Mexican-American fighter and others represented by this attorney had Keane been able to introduce the attorney to Arum.

---

[16] When Keane relayed this to duBoef, duBoef did not deny the epithet; instead, he became angry at the fighter's Mexican promoters for repeating his words and asked Keane to tell the attorney that duBoef would never say something like that.  Keane did not because he knew otherwise.  In fact, Keane had previously heard duBoef make similarly offensive, culturally insensitive remarks about this same attorney.  In addition, duBoef had made offensive, racist comments in Keane's presence about others, including former heavyweight boxing champion Deontay Wilder (see ¶ 64, *supra*) and a former Top Rank receptionist who, like Wilder, is African-American.

**2022:  duBoef Continues To Request Keane's Help And Assures Keane He Will Be Paid In The Future**

73.     Top Rank promoted the April 22, 2022, ESPN fight between Tyson Fury and Dillian Whyte.  Under the terms of the 2019 duBoef Agreement, Top Rank owed Keane five percent of Fury's fight earnings.  duBoef, however, disingenuously claimed that Top Rank could not pay Keane because Top Rank supposedly "lost money" on the fight.

74.     When Keane pressed duBoef and reminded him of the terms of their deal, duBoef told him "not to worry" because Top Rank would make it up to him on Fury's next fight, which supposedly would take place in Saudi Arabia.  Arum repeated these same assurances on June 8, 2022, during a meeting in Los Angeles with Keane.

75.     Contrary to the foregoing assurances, Fury's next fight (against Derek Chisora on December 3, 2022) was not held in Saudi Arabia, but rather in the United Kingdom.  Again, as before, duBoef claimed Top Rank made no money and implored Keane to remain patient until Top Rank was able to promote a fight for Fury in Saudi Arabia.

**January 2023:  duBoef Instructs Keane To Pursue Francis Ngannou**

76.     Francis Ngannou, a heavyweight from Cameroon, is a professional MMA fighter and a professional boxer.  In March 2021, Ngannou defeated Stipe Miocic for the UFC Heavyweight Championship and successfully defended his title ten months later in January 2022, when he defeated Ciryl Gane in UFC 270.  When Ngannou's UFC contract expired in mid-December 2022, he became an unrestricted free agent and publicly stated that he wanted to focus on boxing and hoped to fight Deontay Wilder and Tyson Fury.

77.     Ngannou's announcement piqued duBoef's interest, and Keane was instructed to contact Ngannou and fly to Cameroon if necessary to secure fights with Wilder and/or Fury.

78.     Keane continued to communicate with Ngannou throughout January and

February 2023 on behalf of Top Rank.  duBoef promised to pay Keane his five percent "cut" if he could deliver Ngannou to Top Rank.

**duBoef Repeatedly Uses Kean To Clean Up His Mistakes With ESPN**

79.    From 2020 through 2023, duBoef repeatedly used Keane as his "fixer" with ESPN.  For example, in 2020 duBoef was caught attempting to rig a public purse bid for a championship bout featuring Top Rank fighter Teofimo Lopez. duBoef's emails were exposed in which he was expressly attempting to keep competitors from participating in the bidding process for the fight so that Top Rank could purchase the fight for a cheap price and suppress the purses of the participating fighters. After the emails were exposed in an article by The Athletic,[17] Top Rank went on to lose the purse bid and the right to promote the bout of its star boxer, Lopez.  duBoef called Keane in a panic.  He told Keane to call senior ESPN executives and explain that this was not duBoef's fault and try to place blame elsewhere.

80.    Then, when Lopez found out about duBoef's scheme, he publicly wrote "Todd DuBoef you won't have me back.  Get ready because we going to war! You prick.  How dare you try to cock block my purse bid. . ."  duBoef asked Keane to make contact with Lopez to try and smooth things over so he would stop publicly criticizing him.  He advised Keane to pretend to work for ESPN and assure Lopez that ESPN was very happy with him and excited to continue working together.

81.    Furthermore, when former Top Rank fighter Terence Crawford sued Top Rank in 2022, duBoef called Keane and asked Keane to notify ESPN that duBoef had nothing to do with the lawsuit and blame it on Arum due to Arum's "old school" way of doing things.

82.    In 2022, when Kinahan was placed on the United States' OFAC List, duBoef again called Keane in a panic.  This time, duBoef asked Keane to lie to senior

---

[17] "Accusations, Acrimony and Surprise Bids: How a Growing Rift with Top Rank Pushed Teofimo Lopez to Triller," *The Athletic*, February 26, 2021.  Available at https://www.nytimes.com/athletic/2412739/2021/02/26/teofimo-lopez-vs-top-rank-inside-the-feud-that-forced-a-rising-star-out/

ESPN executives and say that duBoef had nothing to do with Kinahan and had never even met him.

83.    Even more shockingly, on two occasions, duBoef asked Keane to have ESPN employees fired.  duBoef perceived the two employees in question (one, a programming executive; the other, a reporter) as potential threats to his relationship, and he wanted Keane to use his personal relationships with senior ESPN executives to remove them.

**February 2023:  Keane Memorializes And duBoef Ratifies Certain Material Terms Of The 2019 duBoef Agreement In Writing**

84.    On or about February 15, 2023, Keane memorialized the formation and certain material terms of the 2019 duBoef Agreement in a writing sent to duBoef. Specifically, Keane's February 13, 2023, email to duBoef stated, in relevant part:

Todd

I'm happy we connected on this matter. And I appreciate your help and support getting it resolved. But more so I had no idea of the current business model of Top Rank. Every time I've spoken to Bob he's given me no indication that he was pulling back or not as involved as much in the business…

So I think it is even more important that I put in writing as you suggested how we got to this place so we have clarity moving forward…

When I delivered Amir Khan for Terence Crawford for an $8 million purse you came to me and said the 10% was too high for the "big game hunting." So the 10% was dropped to 5%. We agreed this would be the standard moving forward.  I ended up being paid 400k for this fight.
Next I delivered Tyson Fury and the 5% was honored without question moving forward.  I was paid-
650k Schwarz 6/5/19
650k Wallin 9/14/19
1.5m Wilder 2 2/12/20*
750k Wilder 3 10/19/21
*On Wilder 2 you came to me and explained the fight did not do well and asked if you could pay me 750k and the remainder of the balance split 375k and 375k over the next two Fury PPV's that Top Rank promoted. You

honored this with 375k on Wilder 3 and then the remaining balance of 375k.
In addition to this I was also paid 50k for Carl Frampton vs McReary . . .
Prior to ever receiving my first check from Top Rank I was also reimbursed on all my travel expenses in efforts to sign- Amir Khan, Callum Smith, BJ Saunders, Anthony Joshua, GGG, Tyson, Kell Brook, Dillian Whyte.

85.    duBoef responded to the foregoing deal point summary via email on February 16, 2023, stating, in relevant part,[18] "Thanks for the recap" -- thereby effectively confirming and ratifying numerous material terms of the 2019 duBoef Agreement in writing.  Accordingly, the 2019 duBoef Agreement constitutes an agreement in writing for any and all legal purposes, including with respect to calculating the time period afforded to Keane to assert claims for breach of a contract in writing.

**October 2023:   After Fury Defeats Ngannou In Riyadh, Saudi Arabia, duBoef Reneges And Refuses To Pay Keane For That Fight Or Either Of Fury's Past Two Fights.**

86.    As alleged above in Paragraphs 74-75, duBoef and Arum represented to Keane on numerous occasions that Keane would receive full payment for the prior Fury vs. Whyte and Fury vs. Chisora bouts when Fury fought in Saudi Arabia.  On October 28, 2023, Fury fought (and defeated) Ngannou.  Despite the fact that the Fury vs. Ngannou fight was held in Riyadh, Saudi Arabia, duBoef has refused to pay Keane any amounts in connection with Fury vs. Whyte, Fury vs. Chisora or Fury vs. Ngannou.   As alleged in detail below, as a consequence of duBoef's duplicitous conduct, Keane has suffered material consequential damages in excess of $25 million.

///

///

---

[18] Keane's email also proposed deal terms for future fights, to which duBoef responded as follows:  "I will review with Joleen and come back to you with our thoughts.  Btw- will be back in Vegas 2/27 -3/2"

**FIRST CLAIM FOR RELIEF**

**(Breach of Contract)**

87. Keane incorporates and realleges each of the allegations set forth in Paragraphs 1-86, above, as if fully set forth herein.

88. As alleged above in Paragraphs 47-51 and 84, the 2019 duBoef Agreement is a valid, binding contract in writing between Keane, on the one hand, and Top Rank, on the other hand.

89. Keane has performed all of the material obligations required of him under the terms of the 2019 duBoef Agreement including, without limitation, successfully recruiting professional fighters to enter into promotional agreements with Top Rank.

90. Defendants have materially breached the 2019 duBoef Agreement by failing to pay Keane the compensation he was promised in consideration for recruiting Tyson Fury and Josh Taylor to sign promotional agreements with Top Rank, including as follows:

    a. Defendants have failed and refused to pay Keane any portion of Tyson Fury's earnings vs. Dillian Whyte (held on or about April 23, 2022);

    b. Defendants have failed and refused to pay Keane five percent of Tyson Fury's earnings vs. Derek Chisora (held on or about December 3, 2022);

    c. Defendants have failed and refused to pay Keane any portion of Tyson Fury's earnings vs. Francis Ngannou (held on or about October 28, 2023);

    d. Defendants have failed and refused to pay Keane any portion of Tyson Fury's earnings vs. Oleksandr Usyk (held on or about May 18, 2024); and

    e. Defendants have failed and refused to pay Keane any portion of Josh Taylor's earnings in connection with the following boxing matches:

        i. vs. Apinum Khongsong (held on or about September 26, 2020);

        ii. vs. Jose Carlos Ramirez (held on or about May 22, 2021);

        iii. vs. Jack Catterall (held on or about February 26, 2022); and

        iv. vs. Teofimo Lopez (held on or about June 10, 2023).

91.    In addition to the foregoing, as alleged above in Paragraphs 50-51, when the 2019 duBoef Agreement was formed, Keane and duBoef agreed that Keane would ***conditionally*** reduce his fee from ten percent (the amount Arum offered and Keane agreed to) to five percent, and duBoef agreed that if Keane had to chase duBoef for payment after delivering additional fighters, or if duBoef failed to pay Keane his full five percent fee, Keane's fee would <u>retroactively</u> and prospectively revert back to the original ten percent Arum had promised.    Defendants have failed to satisfy the foregoing condition by refusing to pay Keane his five percent fee for each of the fights identified in the foregoing Paragraphs 90.a through 90.e.    As a consequence, Keane is owed a total of ten percent of each Keane-recruited fighter's earnings for each such contest, and Keane further is owed an <u>additional</u> five percent of the earnings received by each Keane-recruited fighter in connection with each of the following other boxing matches:

      a.  Amir Khan's earnings vs. Terence Crawford (held on or about April 20, 2019);

      b.  Tyson Fury's earnings vs. Tom Schwartz (held on or about June 15, 2019);

      c.  Tyson Fury's earnings vs. Otto Wallin (held on or about September 14, 2019);

      d.  Carl Frampton's earnings vs. Tyler McCreary (held on or about November 30, 2019);

      e.  Tyson Fury's earnings vs. Otto Wallin (held on or about September 14, 2019);

      f.  Tyson Fury's earnings vs. Deontay Wilder (held on or about February 22, 2020); and

      g.  Tyson Fury's earnings vs. Deontay Wilder (held on or about October 9, 2021).

92.    As a direct and proximate result of Defendants' foregoing breaches of the 2019 duBoef Agreement, Keane has suffered compensatory damages in an amount to

1  be proven at trial, currently believed to exceed $25 million.

2  <center>**SECOND CLAIM FOR RELIEF**</center>

3  <center>**(Breach Of The Implied Covenant Of Good Faith And Fair Dealing)**</center>

4  93.    Keane incorporates and realleges each of the allegations set forth in
5  Paragraphs 1-86 and 88-92, above, as if fully set forth herein.

6  94.    As a matter of law, in every contract there is an implied promise of good
7  faith and fair dealing.  This implied promise means that each party will not do anything
8  to unfairly interfere with the right of any other party to receive the benefits of the
9  contract.  Good faith means honesty of purpose without any intention to mislead or to
10  take unfair advantage of another.

11  95.    Based on the allegations pleaded herein and incorporated by this reference,
12  Defendants have violated their duty to act fairly and in good faith in their dealings with
13  Keane, including in the following manner:

14  a.  Defendants' promises to pay Keane a percentage of all fight earnings
15  received by every fighter Keane recruited to Top Rank were disingenuous;
16  in reality, Defendants needed to sign well-known, big name fighters to
17  satisfy the terms of the 2017 ESPN Agreement and 2018 ESPN
18  Agreement, used Keane for that purpose in order to maintain deniable
19  accountability and/or liability for tampering, and refused to pay Keane
20  once he succeeded in delivering Tyson Fury and the other high-value
21  fighters Keane recruited for Top Rank;

22  b.  Defendants falsely represented to Keane that he would substantially
23  increase his earnings if he ceased managing professional fighters and,
24  instead, recruited professional fighters to sign promotional agreements
25  with Top Rank;

26  c.  Defendants falsely represented to Keane that if he agreed to reduce his
27  recruiting fee from ten percent to five percent, he would become Top
28  Rank's exclusive recruiter and, as such, his overall compensation would

increase; and

  d. duBoef falsely represented to Keane that if he agreed to reduce his recruiting fee from ten percent to five percent, he would become duBoef's partner and trusted second in command when Arum passed away.

96. As a direct and proximate result of Defendants' breaches of the covenant of good faith and fair dealings implied in and a part of the 2019 duBoef Agreement, Keane has suffered compensatory damages in an amount to be proven at trial, currently believed to exceed $25 million.

### THIRD CLAIM FOR RELIEF

### (Promissory Fraud)

97. Keane incorporates and realleges each of the allegations set forth in Paragraphs 1-86, 88-92, and 94-96, above, as if fully set forth herein.

98. As alleged above in Paragraphs 47-51, Defendants induced Keane to reduce his recruitment fee from ten percent to five percent of the "fighter's purse" amounts paid to each fighter Keane recruited for Top Rank by making the following promises, assurances and representations to Keane:

  a. If Keane accepted a five percent recruitment fee for Khan and for all future fighters he recruited, Keane would become Top Rank's "primary" recruiter;

  b. If Keane became *the* recruiter for Top Rank, he would end up making more money at five percent than he would by being one of many Top Rank recruiters at ten percent;

  c. duBoef would make sure Keane would make a lot more money at five percent than he would have at ten percent because he and Keane would be "partners;" and

  d. If Top Rank failed to pay Keane his full five percent recruiting fee in a timely manner, Keane's recruiting fee would retroactively and prospectively return to the original ten percent agreed to by Arum.

99.    Each of the forgoing promises, representations of material fact (collectively, the "False Promises") was false at the time made by duBoef.

100.    At the time duBoef made each of the False Promises, duBoef knew they were false and had no intent to honor them but nonetheless made each and every one to Keane to induce Keane to materially reduce the financial terms of the 2018 Arum Deal.

101.    Keane relied on each of the False Promises when he agreed to enter into the 2019 duBoef Agreement.

102.    Had Keane known at the time that any of the False Promises were false, Keane would not have entered into the 2019 duBoef Agreement.  Instead, Keane would have exercised his right to enforce full payment under the 2018 Arum Deal.

103.    By virtue of his reliance on the False Promises, Keane has suffered compensatory damages in an amount to be proven at trial, currently believed to exceed $25 million.

104.    In connection with the foregoing allegations, Defendants acted with malice, fraud and oppression toward Keane, thereby entitling Keane to an award of punitive and exemplary damages in an amount to be proven at trial sufficient to deter Defendants and others in similar situations from acting in such manner in the future.

## FOURTH CLAIM FOR RELIEF

### (Quantum Meruit)

105.    Keane incorporates and realleges each of the allegations set forth in Paragraphs 1-86, 88-92, 94-96, and 98-104, above, as if fully set forth herein.

106.    As set forth above, Defendants requested that Keane perform services for Defendants' benefit.

107.    As set forth above, Keane performed the services Defendants requested.

108.    As set forth above, Defendants have failed and refused to compensate Keane, either in whole or in part, for the services Keane performed at Defendants' request.

109.   Keane is thus entitled to recover the reasonable value of the services he performed at Defendants' request in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF

## (Unjust Enrichment)

110.   Keane incorporates and realleges each of the allegations set forth in Paragraphs 1-86, 88-92, 94-96, 98-104, and 106-109, above, as if fully set forth herein.

111.   As set forth above, Defendants requested that Keane perform services for Defendants' benefit.

112.   As set forth above, Keane performed the services Defendants requested.

113.   Defendants have failed and refused to compensate Keane, either in whole or in part, for the services Keane performed at Defendants' request, and therefore have been unjustly enriched in an amount to be proven at trial.

## SIXTH CLAIM FOR RELIEF

## (Accounting)

114.   Keane incorporates and realleges each of the allegations set forth in Paragraphs 1-86, 88-92, 94-96, 98-104, 106-109, and 111-113, above, as if fully set forth herein.

115.   As alleged above, Defendants breached their duties under the 2019 duBoef Agreement by refusing to pay Keane the amounts identified above in Paragraphs 90-91.

116.   As also alleged above, Defendants fraudulently induced Keane to accept a fifty percent reduction of his Top Rank recruiting from ten percent to five percent of the "fighter's purse" amount paid to each fighter Keane successfully recruited to Top Rank.

117.   The exact amount of the payments due and owed to Keane is unknown to him and cannot be determined with certainty without a full accounting of Defendants financial books and records for the period commencing in June 2018 through and including the date on which this action was commenced.

118.    The accounting described in the foregoing paragraph is required to determine the true and just amount due and owing to Keane under the 2019 duBoef Agreement.

**PRAYER FOR RELIEF**

WHEREFORE, Keane prays for judgment as follows:

**On the First Claim for Relief**

1.    For actual and compensatory damages in an amount to be determined at the trial of this action;

2.    For prejudgment interest at the maximum legal rates and to the maximum extent permitted by law; and

3.    For any other relief as the Court may deem just and proper.

**On the Second Claim for Relief**

4.    For actual and compensatory damages in an amount to be determined at the trial of this action;

5.    For prejudgment interest at the maximum legal rates and to the maximum extent permitted by law; and

6.    For any other relief as the Court may deem just and proper.

**On the Third Claim for Relief**

7.    For actual and compensatory damages in an amount to be determined at the trial of this action;

8.    For prejudgment interest at the maximum legal rates and to the maximum extent permitted by law;

9.    For punitive and exemplary damages in an amount sufficient to deter Defendants and others similarly situated from engaging in the dame conduct in the future; and

10.    For any other relief as the Court may deem just and proper.

**On the Fourth Claim for Relief**

11.    For the fair and reasonable value of the services performed by Keane in

an amount to be determined at the trial of this action; and

12.    For any other relief as the Court may deem just and proper.

**On the Fifth Claim for Relief**

13.    For the fair and reasonable value of the services unjustly received by Defendants in an amount to be determined at the trial of this action; and

14.    For any other relief as the Court may deem just and proper.

**On the Sixth Claim for Relief**

15.    For an accounting of all "fight purse" amounts received to date by each fighter recruited by Keane to Top Rank pursuant to the 2018 Arum Deal and the 2019 duBoef Agreement.

DATED:  February 27, 2025                    GLASER WEIL FINK HOWARD
                                             JORDAN & SHAPIRO LLP


                                             By: */s/ Patricia L. Glaser*
                                             _____
                                             PATRICIA L. GLASER
                                             HARRISON J. DOSSICK
                                                Attorneys for Plaintiff
                                                William Keane

COMPLAINT

# DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, on his claims against Defendants Top Rank, Inc., Todd duBoef, and Does 1 – 10, Plaintiff William Keane hereby demands a trial by jury of all matters triable to a jury.

DATED:  February 27, 2025

GLASER WEIL FINK HOWARD
JORDAN & SHAPIRO LLP


By:  /s/ Patricia L. Glaser
PATRICIA L. GLASER
HARRISON J. DOSSICK
Attorneys for Plaintiff
William Keane